## Daniel Gregg v. John N. Wooliscroft & Co.

1. TRADE AND COMMERCE—*Trade Designations—" Cool and Sweet Oats."*—In the grain markets and among grain dealers the name of " cool and sweet oats" has been given to oats of another quality. " Cool and sweet oats" may be damp, unclean and light in weight, and even so defective and faulty that it will not fill the requirements of any trade. It is only required that the grain be sound, and that it arrive at its destination " cool and sweet."

2. CONTRACT — *Made by Postal Correspondence.*—Where an acceptance of a contract is to be made by mail, the proposer may withdraw his offer at any time before a letter is posted accepting it.

3. AGENCY—*Who is a Special Agent.*—A special agent is one invested with limited specified powers which he is authorized to exercise only for a particular purpose. His power is measured by the express directions given by the principal.

4. AGENCY—*Who is a General Agent.*—A general agent is one who is empowered to act generally for the principal in some particular business, and to do all acts in connection with the particular business.

5. AGENCY—*Volume of Business Does Not Determine the Extent of the Agent's Authority.*—The volume of business transacted by an agent, does not determine the extent of his authority, for he may have acted only by express directions in each particular instance, and the volume of the business have been simply the result of the execution of numerous special orders from his principal.

6. AGENT—*Construction of Letter of Authority.*—Appellee wrote to a grain broker, "We want oats quite badly and can pay 25 cents for August, and 24 cents for September." Under the terms of the letter, *it was held,* that he had no power to make a contract for the sender of the letter to buy ten cars cool and sweet oats, for each August and September delivery.

**Memorandum.**—Assumpsit. Breach of contract of sale. Appeal from the Circuit Court of Vermilion County; the Hon. FERDINAND BOOKWALTER, Judge, presiding. Heard in this court at the May term, 1893. Reversed and remanded. Opinion filed October 28, 1893.

The opinion states the case.

F. LINDLEY and G. W. SALMANS, attorneys for appellant.

CALHOUN, STEELY & JONES, and E. R. E. KIMBROUGH, attorneys for appellee.

MR. PRESIDING JUSTICE BOGGS DELIVERED THE OPINION OF THE COURT.

This is an appeal from a judgment in favor of the appellee in the sum of $700, as damages, occasioned by the refusal of the appellant to deliver ten car loads of cool and sweet oats in August, 1890, and the like quality of same character of oats in September of the same year, as appellee alleges appellant contracted to do.

The appellant, in 1890, was a grain dealer at Danville, Illinois. The appellee was at the same time engaged in the like trade at Cincinnati, Ohio, the firm consisting of one member only, John N. Wooliscroft. One D. R. Evans, in

June of the year named, was a grain broker in Danville, and in that capacity purchased grain for a number of customers, among them the appellee. As to the manner in which he conducted the brokerage business, Evans states that his customers would furnish him prices and he would go to parties, consummate the trades and would then name his principal to the seller. The appellee's right of recovery rests upon a contract which he alleges Evans made for him with the appellant, by which the appellant became bound to deliver to him, on board the cars at Danville, ten car loads of cool and sweet oats, during August, 1890, at twenty-five cents per bushel, and ten car loads of oats of same quality to be likewise delivered in the month of September, 1890, at twenty-four cents per bushel. The appellant denies that he entered into the alleged contract. The facts relating to this supposed contract as shown by the evidence, are about these: On the 24th day of June, 1890, Evans received a letter from the appellee, which, so far as it relates to the matter in hand, is as follows:

CINCINNATI, June 23, 1890.

D. R. Evans, Danville, Illinois.

DEAR SIR: * * * We want oats quite badly and can pay 25 cents for August and 24 cents for September. We look for a good demand for oats.

Yours truly,

J. N. WOOLISCROFT & CO.

This letter, it will be observed, does not mention or indicate the grade or quality of oats for which t he prices named would be paid nor does it expressly direct Evans to buy for the writer. Both Evans and Wooliscroft agree that the relations between them arising from prior transactions were such that the letter was understood and intended as a direction to buy. It appears conclusively from the testimony that in the grain trade, propositions to sell, directions to buy, or contracts of purchase and sale of oats, where no grade or quality is specified, oats that will grade No. 2 is understood and implied. This is shown to be an unvarying rule among dealers in grain. To grade No. 2, oats must be

dry and reasonably clean, the grain sound and plump, in a degree that a measured bushel will reach the legal standard of weight.

In the grain markets and among grain dealears the name of "cool and sweet oats" has been given to oats of another quality; cool and sweet oats may be damp, unclean and light in weight, and even so defective and faulty that it will not fill the requirement of any grade. It is only required that the grain be sound and that it arrive at its destination "cool and sweet."

There is a material difference in the market value of "cool and sweet" and No. 2 oats, the latter being worth from two to five cents per bushel more than the former. Mr. Evans testifies concerning still another designation or trade name descriptive of other oats which he calls "mixed oats." No other witnesses testified concerning it, and he seems to have only an indistinct and vague idea about it.

He was not able to name its requisite qualities or tell how it might be distinguished from other grades; he said that "cool and sweet" might not be "mixed" oats, but that the distinction was very indefinite. He could give no further information upon the subject. We think the trade has not adopted the name of "mixed oats" as a trade designation, but so far as shown from the evidence in this case, oats of any grade or quality may be of mixed oats. Evans received appellee's letter on the 24th of June and called on the appellant on the same day. A conversation occurred between them which appellee relies upon to constitute the contract sued upon.

Evans' version of this conversation, given in his examination in chief as a witness for the appellee is, that he told Gregg he had received instructions from the appellee to pay twenty-five cents per bushel for mixed oats for August shipment and twenty-four cents per bushel for mixed oats for September shipment, and that Gregg refused to sell mixed oats but offered to sell ten cars of "cool and sweet" oats at the prices named for the respective months and that he, acting for the appellee, accepted the offer and closed the contract accordingly.

The appellant's version of this conversation is that Evans offered him the prices named for "No. 2," and that he declined to accept, but told Evans he would contract to sell ten cars of cool and sweet oats for each of the months at the respective prices named, and that Evans said he would submit the proposition to the appellee company and then went away.

On the same day Evans sent to the appellee the following telegram:

"Gregg accepts your offer 25 and 24—10 cars each mixed oats August and September shipment to arrive cool and sweet 110 per cents points.

D. R. EVANS."

It is further apparent from this dispatch that Evans was laboring under a confusion of ideas as to "cool and sweet" and mixed oats.

As the words "mixed oats" which he used in the telegram did not indicate any particular grade or quality of grain, we think grade "No. 2" was implied. True, the words cool and sweet are used, but were effectual only to indicate the condition of the oats at time of arrival and not as fixing the grade.

The appellee interpreted the message as we have and on the same day forwarded to the appellant this dispatch:

JUNE 24, 1890.

D. Gregg and Son, Danville, Illinois.

We bought from you this day 10,000 bushels, ten cars, August shipment, grade 2, mixed oats, price 25 cents; 10,000 bushels, ten cars, September shipment, grade 2, mixed oats, at 24 cents.

Yours truly,

Instructions later.          J. N. WOOLISCROFT & Co.

The appellant received this on the 25th of June, and on the same day notified Evans and the appellee that he had not offered to sell or sold No. 2 oats, and that he canceled his offer to sell cool and sweet oats. Evans in reply insisted that a contract had been closed for "cool and sweet oats," and that it must stand; that he would see that the appellee confirmed it as a purchase of cool and sweet oats.

The appellant refused, however, to make any new agreement, and asserted his right to "cancel all that had been done and announced that he withdrew his offer as to cool and sweet oats."

On the 26th of June the appellee wrote the appellant, that he had changed the entry of the contract for August and September oats to "cool and sweet" instead of "No. 2." The appellant refused to consider himself bound by what had occurred, so notified the appellee and Evans, and did not and would not deliver the grain.

The appellee instituted his action, and upon a hearing before a jury secured a verdict in his favor upon which judgment followed.

It is urged that it ought to be conceded that the jury accepted the version given by Evans of the conversation which it is claimed resulted in a contract. If that position be granted, still we are at a loss to know how it can be made to appear that the parties entered into a contract.

Evans' testimony is that the appellant offered to sell ten cars cool and sweet oats for each August and September delivery, and that he as agent for the appellee accepted the offer.

Was he authorized to make such a contract for the appellee?

We do not think the letter written him by the appellee gave him such authority. Interpreted as it must be as to the grade of oats to be bought by the usages, custom and rules of the branch of business in which all the parties were engaged, the letter only authorized him to buy No. 2 oats, and to that extent and effect only did it bind the appellee. It is apparent that the appellee so intended it to be understood, for in response to Evans' telegram to him that "Gregg accepts your offer," ten cars mixed oats "to arrive cool and sweet," he forwarded a dispatch to the appellant, saying: "We bought from you ten cars August shipment, grade 2, mixed oats * * * and ten cars September shipment, grade 2." The intention and understanding of the appellee further appears from his letter to appellant, written under date of

June 26, in response to appellant's notification that the offer of cool and sweet oats made to Evans was withdrawn, in which letter appellee says:

"We have changed the entry for the ten cars each August and September to cool and sweet oats instead of No. 2. We are short these oats and must have them even as cool and sweet oats. We will endeavor to put them upon other sales to interior points and get other oats grading No. 2, but as the case now stands we have to keep these twenty cars as per your understanding with Evans."

It is manifest from this extract from appellee's letter that the purpose and intent of the appellee when he indited the letter to Evans was to authorize Evans to buy No. 2 oats, but that as he at the time when writing to the appellant "was short of oats," he had concluded as the "case then stood" to take the oats though only "cool and sweet," and try to get elsewhere the No. 2 oats that he really authorized and expected Evans to buy. It seems perfectly clear that Evans was not authorized by the letter in question to buy "cool and sweet oats" for the appellee at the time he claims to have made the contract with the appellant upon which the suit is brought. His contract, if any he made on that occasion, so far as the latter was concerned did not bind the appellee. It is suggested that appellee ratified and confirmed the alleged contract. He did not do so by the letter of confirmation, for in it he expressly confirms a sale and purchase of No. 2 oats and the appellant had withdrawn his offer or canceled the sale before appellee took any further action whatever.

Before the appellee wrote the letter from which we last quoted he had received notice from Evans and also from the appellant that the appellant had revoked his offer and canceled any alleged sale. If the appellant offered to sell cool and sweet oats and Evans accepted the offer for the appellee the acceptance was unauthorized and not binding on the appellee until he adopted it, and in such case the appellant might lawfully withdraw the offer at any time before the appellee had accepted. When an acceptance is to be made

by mail the proposer may withdraw at any time before a letter is posted accepting it.   3 Amer. & Eng. Ency. 856.

But it is suggested that Evans, aside from any authority given by the letter, was a general agent for appellee, with full power and authority to buy oats of any grade for him, and that he made the alleged contract with the appellant by virtue of this general power, and thereto bound the appellee, his principal, and consequently the appellant became likewise bound.

The appellee testified that Evans was at the time his general agent and authorized to buy any kind or quality of oats for him without regard to the letter.  Whether the agency was a general or special one was a question of law arising from the facts proven.   In relation to the scope of his authority as agent, Evans testified, when on the stand in behalf of the appellee in rebuttal, that he did not make an offer to the appellant for No. 2 oats; that he had no authority to buy No. 2 oats; that his authority to buy was "right in that letter," and it was to buy "cool and sweet" oats. He stated also that his business was that of a grain broker, and the plan upon which he did business was that his customers would advise him as to grain they desired the price to be given, etc., and he would purchase according to such advices.   He simply executed the orders of his customers as he received them.

A special agent is one invested with limited specified powers which he is authorized to exercise only for a particular purpose.   Chitty on Contracts, 285; Story on Agency, Sec. 58.

Such was the extent of Evans' authority in the transaction in question, whether it arose from his general plan or system of conducting his business, or rested upon the letter written him by the appellant, upon which he insisted he acted, and from which he claimed to derive his power.

The power of a special agent is measured by the express directions given by the principal.   1 Parsons, Contract, 40.

A general agent is one who is empowered to act generally for the principal in some particular business, and to do all

acts in connection with the particular business. 1 Amer. & Eng. Ency. of Law, 348-9; Nat. Furnace Co. v. Keystone, 110 Ill. 427.

It seems perfectly clear that Evans had not power to deal for and bind the appellee as his general agent.

It is in proof that Evans bought many cars of oats and of other grain for the appellee. This is relied upon as establishing the claim that he was a general agent. It is not, however, shown that he made such purchases otherwise than in pursuance of special directions given him from time to time to do so, as was his general custom or system of transacting the business in which he was engaged.

The volume of business transacted by an agent does not determine the extent of his authority, for he may have acted only by express directions in each particular instance, and the volume of the business have been simply the result of the execution of numerous special orders from the principal.

Evans considered that his authority was to be found in the letter of the appellee. Nothing to the contrary seems to us to have been proven. As we construe the letter, in the light of the undisputed evidence, the authority given was to purchase No. 2 oats. Consequently he was unauthorized to buy cool and sweet oats, or to bind the appellee to a contract for that grade of oats. We think the minds of the parties did not meet upon the terms and conditions of a contract, and that neither became bound to the other.

Therefore the judgment appealed from can not be upheld, but must be and is reversed and the cause remanded.